UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

LAWRENCE PERRY )
)
      Petitioner )
)
v. )   Civil No. 06-217-P-H
)
STATE OF MAINE )
)
      Respondent )

## RECOMMENDED DECISION ON
## MOTION TO STAY STATE PROCEEDINGS PURSUANT TO 28 U.S.C. § 2251
## AND ON AMENDED 28 U.S.C. § 2254 PETITION

Lawrence Perry is imminently facing service of a three-day sentence in the State of Maine for illegal possession of a deer killed at night and has been burdened with the imposition of fines on five other fish and game violations. Pending in this court is Perry's amended 28 U.S.C. § 2254 petition (Docket No. 7) in which he contends, one, that he was denied due process when he was convicted pursuant to a flawed accomplice liability instruction and, two, the participation of an undercover warden in criminal activity renders Perry's conviction, premised on this warden's investigation, fundamentally unfair. The State has filed a motion to dismiss. Perry has responded to that motion (Docket No. 12), and the State indicated that it intended to waive its reply.

Even though Perry has not begun to serve his sentence, this court has jurisdiction over the 28 U.S.C. § 2254 petition as he meets the "in custody" requirement for filing such petitions as his situation aligns with that of the petitioners in Hensley v. Municipal

Court, 411 U.S. 345, 351-53 (1973) and Justices of Boston Municipal Court v. Lydon, 466 U.S. 294, 300-04 (1984).

Perry has also filed a motion to stay the state proceeding pursuant to 28 U.S.C. § 28 U.S.C. § 2251.  (Docket No. 8.)  Section 2251 of title 28 provides:

> A justice or judge of the United States before whom a habeas corpus proceeding is pending, may, before final judgment or after final judgment of discharge, or pending appeal, stay any proceeding against the person detained in any State court or by or under the authority of any State for any matter involved in the habeas corpus proceeding.

28 U.S.C.A. § 2251(a)(1).  Although this provision is usually relied on to stay a sentence of execution by an incarcerated movant there is some (limited) precedent for invoking this statute when an individual is facing a non-capital state court proceeding.  See Gilliam v. Foster, 61 F.3d 1070 (4th Cir. 1995)[1]; U.S. ex rel. Aleman v. Circuit Court of Cook County, 967 F.Supp.1022 (N.D. Ill. 1997); St. John v. State of N.C., 745 F. Supp.1165 (W.D.N.C. 1990); Choung v. People of State of Cal.,320 F.Supp. 625 (D.C. Cal. 1970); Pugach v. Klein, 193 F. Supp. 630 (D.C.N.Y. 1961); Soulia v. O'Brien, 94 F. Supp. 764 (D.C. Mass. 1951).

In his motion for stay Perry contends that the only way to preserve his legal rights under the United States Constitution is to stay all proceedings in the state superior court, including the execution of the jail term -- scheduled to commence February 23, 2007 -- and the collection of all currently due fines.  The State responds that Perry is not entitled to a stay as he has not demonstrated that he is entitled to federal habeas relief and it cites the argument made in its motion to dismiss the 28 U.S.C. § 2254 petition.  Perry has filed

---

[1]      This double jeopardy challenge was heard on an emergency motion by the Sixth Circuit and there were five dissents authored, mainly voicing a concern about the implications of a federal court staying an ongoing state criminal proceeding.

a pleading which is characterized as a response to the State's motion to dismiss and the

State's response to his motion to stay.

I turn to the merits of his amended § 2254 petition. The Antiterrorism and

Effective Death Penalty Act of 1996 ('AEDPA') provides that:

> **(d)** An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted with
> respect to any claim that was adjudicated on the merits in State court
> proceedings unless the adjudication of the claim—
>> **(1)** resulted in a decision that was contrary to, or involved an
>> unreasonable application of, clearly established Federal law, as
>> determined by the Supreme Court of the United States; or
>> **(2)** resulted in a decision that was based on an unreasonable
>> determination of the facts in light of the evidence presented in the
>> State court proceeding.
>
> **(e)(1)** In a proceeding instituted by an application for a writ of habeas
> corpus by a person in custody pursuant to the judgment of a State court, a
> determination of a factual issue made by a State court shall be presumed to
> be correct. The applicant shall have the burden of rebutting the
> presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(d),(e).

With respect to § 2254(d)(1), this court reviews the decision of the Law Court

through the following prism:

> The "contrary to" category "embraces cases in which a state court decision
> directly contravenes Supreme Court precedent." Mastracchio v. Vose, 274
> F.3d 590, 597 (1st Cir.2001) (citation omitted). The "unreasonable
> application category" includes cases in which the state court's decisions,
> while not "contrary to" relevant Supreme Court precedent, nonetheless
> constitute an "unreasonable application" of that precedent. Id.
>     The Supreme Court has said that "[u]nder the 'contrary to' clause,
> a federal habeas court may grant the writ if the state court arrives at a
> conclusion opposite to that reached by the [Supreme] Court on a question
> of law or if the state court decides a case differently than the [Supreme]
> Court has on a set of materially undistinguishable facts." Williams v.
> Taylor, 529 U.S. 362, 412-13 (2000). The "unreasonable application"
> analysis, however, affords relief only if "the state court identifies the
> correct governing legal principle from the [Supreme] Court's decisions but
> unreasonably applies that principle to the facts of the petitioner's case." Id.
> at 413.

> A state court <u>need not cite or be aware of Supreme Court precedents</u> so long as "neither the reasoning nor the result of the state-court decision contradicts them." <u>Early v. Packer</u>, 537 U .S. 3, 8 (2002).

<u>Knight v. Spencer</u>, 447 F.3d 6, 11 -12 (1st Cir. 2006) (emphasis added).[2]

Perry was convicted by a jury of nine fish and game violations: (1) a guide license violation; (2) unlawfully hunting bear with dogs; (3) a closed season violation; (4) having a loaded firearm in a motor vehicle; (5) hunting without hunter orange clothing; (6) violating a commissioner's rule by hunting antler- less deer without a permit; (7) illegal possession of a deer killed at night; (8) having a loaded firearm in a motor vehicle; and (9) driving deer.  The Maine Law Court vacated his conviction on three of these counts: (1) the guide license violation because the alleged conduct was neither a crime nor a civil violation; (5) hunting without hunter orange clothing because the offense was not a crime at the time it was committed; and (8) having a loaded firearm in a motor vehicle, because the accomplice liability instruction was erroneous and there was a reasonable probability that Perry would not have been convicted on this count had the instruction been correct.

### *Fine –Only Counts of Conviction*

While Perry focuses on the count of conviction for which he is to serve time, he also asserts that those remaining grounds on which he was fined should also have been

---

[2]     The sequential organization of <u>Knight v. Spencer</u>, suggests that the failure to cite to the relevant Supreme Court precedent is not only not a hindrance to undertaking the "contrary to" analysis but would not prevent the federal court from proceeding with the 'unreasonable application' inquiry.  The <u>Early</u> discussion, on which the First Circuit draws in <u>Knight</u>, is pegged to the "contrary to" prong of the § 2254(d)(1) analysis.

        With respect to this concern, the First Circuit observed in <u>Hurtado v. Tucker</u>:
        A total failure by the state court to discuss any constitutional claim may mean that there was no such claim "adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d) (West Supp.2000); <u>see</u> <u>Washington v. Schriver</u>, 240 F.3d 101, 107 (2d Cir.2001). Here, however, the state appeals court adjudicated Hurtado's claims on their merits. We do not reach the question of how to analyze whether there has been an "unreasonable application of" clearly established federal law where there is no state court analysis of the claims.
245 F.3d 7, 18 n.18 (1st Cir. 2001).

vacated due to the faulty instruction and describes the Maine Law Court reasoning as to

the want of prejudice on the remaining five grounds as "interesting" but asserts that,

> it really is not possible to so neatly cabin the corrosive effect of the
> overbroad accomplice instruction as applied to counts where it was
> factually irrelevant, because the jury was very capable of misapplying the
> law, since the instruction was given by the court relating to counts where it
> should not have been given.

(Amended § 2254 Mot. at 4.)[3]  However, habeas is not available as a remedy for fine-

only convictions although the defendant remains subject to the supervision of the court

and failure to pay the fine could result in incarceration."  Tinder v. Paula, 725 F.2d 801,

804 (1st Cir. 1984) (collecting cases); accord Obado v. New Jersey, 328 F.3d 716, 717 -

18 (3d Cir. 2003).

### Accomplice Liability Instruction and Perry's Illegal Possession of a Deer Killed at Night Conviction[4]

In his amended 28 U.S.C. § 2254 petition Perry argues apropos his first ground

that the Maine Supreme Court in deciding his direct appeal concluded that the

prophylactic accomplice liability instruction given by the trial judge as to all counts was

---

[3]  In responding to the motion to dismiss Perry adds very little to his argument:
> [R]elating to the State assertions concerning plain or obvious error, the Maine Supreme
> Court already found that the Accomplice Instruction was plain or obvious error where the
> evidence supported possible accomplice liability. Decision par. 17. The court invalidated
> a conviction based upon the exact same accomplice liability facts as the count Petitioner
> challenges most directly, and the one under which he received a term of incarceration.
> Clearly this Count of conviction is cognizable by This Court. The other counts of
> conviction are similarly relevant here, as the flawed instruction was likewise prejudicial
> to Petitioner in the counts where the Law Court has recognized that the instruction should
> not have been given at all.
(Resp. Mot. Dismiss at 2.)

[4]     The State argues that Perry did not adequately apprise the Maine Law Court that he was presenting
a claim of a "federal constitutional violation" and that this court need not address the claim under Baldwin
v. Reese, 541 U.S. 27 (2004).  (Mot. Dismiss at 5.)  However, in his brief to the Law Court Perry cited
Morrissette v. United States which held: "Where intent of the accused is an ingredient of the crime charged,
its existence is a question of fact which must be submitted to the jury." 342 U.S. 246, 274 (1956).  The Law
Court clearly understood the nature of this challenge.
        The State also urges this court to conclude that the Law Court determined that Perry procedurally
defaulted his claim and that this conclusion by the Law Court was an independent and adequate state law
ground for denying Perry federal habeas relief.  However, the Law Court did address the claim on the
merits, although through the lens of plain error.

improper but only overturned his conviction on one count - having a loaded firearm in a motor vehicle -- on this basis. Perry argues that the count of conviction that he now faces the three-day incarceration on was "actually wholly dependent upon this flawed accomplice instruction and should also be vacated." (Amended § 2254 Pet. at 3.) Perry argues that the conduct of the vacated count of having a loaded firearm in a motor vehicle was so temporally linked with the conduct of illegal possession of a deer at night – in that it was Chad Nelson, a relative of Perry's girlfriend,[5] who had the shotgun that shot the deer that was then placed in the back of Perry's truck – that it "seems the Law Court inadvertently made no finding relating to this count, as the analysis employed relating to the additional counts does not include this one. The accomplice instruction, found to be invalid, applied to this count of conviction." (Id. at 3-4.)

The Maine Law Court's decision on Perry's direct appeal summarized the posture of the accomplice liability dispute as follows:

> The State requested an instruction on accomplice liability for the three night hunting charges. Over Perry's objection that the evidence did not generate an accomplice liability instruction, the court gave the following instruction:
>> A person may be guilty of a crime if he personally does the acts that constitute the crime or if he's an accomplice of the person who actually commits the crime; however, a person is not made an accomplice merely because he is in the presence of the person who actually committed the crime or the goods taken in a crime.
>> Also, on the question of accomplice liability, it makes no difference whether one receives any benefit from the crime or not.
> Although the State had requested the accomplice liability instruction only with respect to the night hunting charges, the court did not specify that the instruction was limited to the night hunting charges. At the conclusion of the instructions, the court inquired of counsel if there was "[a]nything else on the instructions?" Perry's counsel responded, "No, just the one I brought up before." Apparently, that was a reference to his objection that the accomplice liability instruction was not generated by the evidence.

---

[5]       Counsel actually described Chad Nelson as Perry's nephew.

When Perry objected to the accomplice liability instruction, it was on the ground that the evidence of night hunting did not generate the instruction. Perry now argues that the instruction was erroneous because it failed to specify that an intent to facilitate the crime is required for accomplice liability, and he argues that the instruction should have been limited to the night hunting charges. Because Perry did not specifically object to the instruction on those grounds, he did not properly preserve the objections, and, therefore, we review the instruction for obvious error. See State v. Berry, 1998 ME 113, ¶ 10, 711 A.2d 142, 145. [¶ 15]

When obvious error is the standard of review, an erroneous jury instruction will lead to the vacation of a conviction only if the "instruction constituted 'a seriously prejudicial error tending to produce manifest injustice.' " State v. Powell, 452 A.2d 977, 978 (Me.1982) (quoting State v. Daley, 440 A.2d 1053, 1055 (Me.1982)). To determine if an erroneous definition of an essential element constitutes obvious error, we look to whether there is "a reasonable possibility that an instruction correctly defining [the element] would have resulted in a different verdict." State v. Walker, 512 A.2d 354, 356 (Me.1986). If we cannot say that the jury would not have resolved the issue differently if it had been correctly instructed, we must vacate. Powell, 452 A.2d at 978.

State v. Perry, 2006 ME 76, ¶¶12-15, 899 A.2d 806, 812-13.

Regarding Perry's challenge to this instruction the Law Court concluded:

We consider first Perry's contention that the evidence did not generate the accomplice liability instruction. When the evidence puts the defendant at the scene of a crime, "accomplice liability may attach upon the State's proof of any conduct promoting or facilitating, however slightly, the commission of the crime." State v. Pheng, 2002 ME 40, ¶ 9, 791 A.2d 925, 927. There has to be some evidence that the defendant was present and aided in the commission of the crime. See State v. Wright, 662 A.2d 198, 202 (Me.1995). Insofar as there was error in giving an accomplice liability instruction that applied to all offenses, we do not find that the error was so seriously prejudicial that it tended to produce a manifest injustice.

Next we analyze Perry's contention that the accomplice liability instruction, which failed to include the element of intent, was obvious error and requires vacation of the convictions. As discussed below, we conclude that the erroneous instruction was not seriously prejudicial with the exception of the conviction for having a loaded firearm in a vehicle on November 27.

2006 ME 76, ¶¶16-17, 899 A.2d at 813.

With regard to the offense of illegal possession of a deer killed at night the Law Court reasoned: "The offense of illegal possession of a deer killed at night was based on the evidence that two others loaded the deer into Perry's truck at Perry's express direction. Th[is] … offense[] w[as] based on Perry's own actions. The accomplice liability instruction did not seriously prejudice Perry." Perry, 2006 ME 76, ¶19, 899 A.2d at 813-14.

Perry insists the reasoning of the Law Court vis-à-vis the vacated "having a loaded firearm in a motor vehicle" conviction should have been applied to the illegal possession of a deer killed at night because the conduct temporally overlapped. With regard to the "loaded firearm in the motor vehicle" infirmity the Law Court reasoned:

> Further analysis, however, is necessary with regard to Perry's conviction for having a loaded firearm in a motor vehicle on November 27, 2003. That charge arose from the shooting of a deer at night by someone else. The elements of the offense are: (1) having "any firearm with a cartridge or shell in the chamber or in an attached magazine, clip or cylinder"; and (2) "[w]hile in or on a motor vehicle." 12 M.R.S.A. § 7406(9-A). There was evidence that the hunter who shot the deer loaded his firearm while in Perry's truck. Perry himself did not load the firearm or have physical possession of it. An accomplice liability instruction was appropriate based on these facts, which included Perry telling the warden to have his rifle "ready" in the presence of the hunter.
>
> We agree with Perry, however, that the instruction was erroneous because it did not state that intent to facilitate the crime is an element of accomplice liability. The accomplice liability statute provides in pertinent part that "[a] person is an accomplice of another person in the commission of a crime if:"
>
>> A. With the intent of promoting or facilitating the commission of the crime, he solicits such other person to commit the crime, or aids or agrees to aid or attempts to aid such other person in planning or committing the crime. A person is an accomplice under this subsection to any crime the commission of which was a reasonably foreseeable consequence of his conduct.
>
> 17-A M.R.S. § 57(3)(A) (2005).
>
> The court's instruction did not accurately represent the statutory definition of accomplice liability because it failed to mention the intent element. The Maine Jury Instruction Manual warns that "any instruction

on accomplice liability must avoid any suggestion that a conviction could be obtained by any lesser mental state." Alexander, Maine Jury Instruction Manual § 6-31 at 6-44 to 6-45 cmt. (4th ed.2005).

There is a reasonable possibility that the outcome on this charge would have been different with a correct accomplice liability instruction. Because of the reasonable possibility that Perry would have been acquitted if the instruction correctly defined accomplice liability, see [State v.] Walker, 512 A.2d [354,] 356 [(Me. 1986)] the erroneous instruction was both obvious and prejudicial. Therefore, we vacate the conviction for having a loaded firearm in a motor vehicle on November 27, 2003.

2006 ME 76, ¶¶ 22-25, 899 A.2d at 814 -15.

With respect to this 28 U.S.C. § 2254 review of Perry's accomplice liability instruction claim, in California v. Roy, 519 U.S. 2, 3-6 (1996) the Supreme Court addressed a similar omission-of-intent jury instruction claim in the context of a 28 U.S.C. § 2254 review. The Supreme Court rejected the Ninth Circuit's framing of the harmless error standard as: "[T]he omission [of the 'intent' part of the instruction] is harmless only if review of the facts found by the jury [namely, assistance and knowledge] establishes that the jury necessarily found the omitted element [namely, 'intent'].'" Id. at 4. In the pre-AEDPA Roy, the Court concluded that when a federal court reviews a state court determination in a habeas proceeding, the standard articulated in Kotteakos v. United States, 328 U.S. 750 (1946) applies, " namely, 'whether the error "had substantial and injurious effect or influence in determining the jury's verdict." '" id. at 5 (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993), in turn, citing Kotteakos, 328 U.S. at 776), "for reasons related to the special function of habeas courts" id. at 6. The Roy Court explained that, whereas a state court may be required under the Constitution to apply a "stricter" harmless-beyond-a-reasonable-doubt Chapman v. California, 386 U.S. 18 (1967) standard when reviewing a conviction directly, "where a judge, in a habeas proceeding, applying this standard of harmless error, 'is in grave doubt as to the

harmlessness of an error,' the habeas 'petitioner must win.'"  519 U.S. at 5 (quoting

O'Neal v. McAninch, 513 U.S. 432, 437 (1995)).  It is hard to square this pre-AEDPA

fashioned review standard with the directive of the codified standard for review in 28

U.S.C. § 2254(d)(1) and the marching orders that the Supreme Court has since given

federal courts in applying that standard, see, e.g.,  Williams, 529 U.S. at 412-13.

The State asserts that United States v. Olano, 507 U.S. 725 (1993) is the

applicable "clearly established federal law" within the meaning of 28 U.S.C.

§ 2254(d)(1). This is not far off the mark, but Olano addressed the appropriateness of

plain error review on direct review apropos the presence of alternate jurors in

deliberations, and perhaps the Maine Law Court would not be expected to extend that

holding to Perry's challenge to the accomplice instruction,  see Carey v. Musladin, __

U.S. __, 127 S. Ct. 649 (Jan. 16, 2007). However, there is Supreme Court precedent that

directs federal courts reviewing constitutionally inadequate jury instructions to undertake

harmless error review, Neder v. United States, 527 U.S. 1, 8-12 (1999) (concluding, in

reviewing a decision of the Eleventh Circuit regarding Neder's direct appeal, that a jury

instruction that omits an element of the offense could be subject to harmless error review,

and was not structural so as to defy harmless error review), or plain error review, see

Johnson v. United States, 520 U.S. 461 (1997).

There is no dispute that the Maine Law Court was correct in concluding that Perry

did not make a timely objection to the instruction on the grounds he now presses and that

plain error review was appropriate.  (The Law Court used the term "obvious" error, but

<u>Olano</u> makes clear that: "'Plain' is synonymous with 'clear' or, equivalently, 'obvious.'" 507 U.S. at 734.)[6]

The <u>Johnson</u> Court expressed the <u>Olano</u>/ Federal Rule of Criminal Procedure 52(b) test thusly:

> Under that test, before an appellate court can correct an error not raised at trial, there must be (1) "error," (2) that is "plain," and (3) that "affect[s] substantial rights." [<u>Olano</u>,] 507 U.S., at 732. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error "''seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'''" <u>Ibid.</u> (quoting <u>United States v. Young</u>, <u>supra</u>, at 15, in turn quoting <u>United States v. Atkinson</u>, 297 U.S. 157, 160 (1936)).

<u>Johnson</u>, 520 U.S. at 466-67. As the Law Court did conclude that the instruction was plainly/obviously erroneous, I will accept that position for the purpose of resolving this petition. The next question for this court is whether the error affected Perry's substantial rights. <u>Johnson</u> left open the question of whether or not the failure to submit materiality to the jury in Johnson's trial for perjury affected Johnson's substantial rights, <u>id.</u> at 468-69, and as in <u>Johnson</u>, the court need not decide the question here. This is because, even if the improper accomplice instruction affected Perry's substantial rights, the Maine Law Court's conclusion that the error was not  "prejudicial" in that it did not affect the outcome of the trial court proceedings, <u>Olano</u>, 507 U.S. at 734, is not contrary to or an unreasonable application of the <u>Johnson</u>/<u>Olano</u> fourth prong determination as to whether

---

[6]     Federal Rule of Criminal Procedure 52 provides:
    **(a) Harmless Error.** Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.
    **(b) Plain Error.** A plain error that affects substantial rights may be considered even though it was not brought to the court's attention.
Fed. R. Crim. P. 52. Maine Rule of Criminal 52 provides:
    **(a) Harmless Error.** Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.
    **(b) Obvious Error.** Obvious errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.
Me. R. Crim. P. 52.

or not the "forfeited error 'seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings,'" Johnson, 520 U.S. at 469-70 (quoting Olano, 507 U.S. at 736).

The Law Court concluded that the evidence was that Perry was convicted on the illegal possession of a deer killed at night charge not as an accomplice but because of his first- hand involvement in the illegal conduct, emphasizing his directive to load the deer into his own truck. As to his potential non-accomplice exposure, Perry does not argue that the instruction on the illegal possession of deer killed at night was incorrect. The instruction was: "In order to prove the charge of illegal possession of deer killed at night, the State must prove beyond a reasonable doubt that Mr. Perry possessed a deer that had been killed during the period from 30 minutes after sunset to 30 minutes before sunrise of the following day." (Trial Tr. Vol. III at 20.)

Regarding the conduct relevant to this charge, the undercover agent testified that the night of November 26 Perry talked about "going riding" which the agent knew meant hunting. (Trial Tr. Vol. I at 107.)   Perry said that they would go early in the morning. (Id.) Perry got up at 3:45 in the morning, told the agent that he was going riding and asked if he wanted to come. (Id. at 108.) Chad Nelson also indicated he wanted to go. (Id.) Perry informed the two that he did not want to bring "a bunch of guns' just two and he handed one to the agent and instructed him to get it ready and Chad Nelson asked if he could bring his gun to which Perry agreed. (Id.. at 108, 210-11.) The agent testified:

> So it was just the two firearms, got in Mr. Perry's truck. And we got dressed fairly quickly. As soon as we pulled, pulled out of his driveway there just happened to be a doe deer standing right in the middle of the road. I said – Mr. Perry said it's a buck. He says it's an F'ing deer, he said it's an F'ing buck, he said shoot it. And I didn't want to be the one to have to shoot it, so I didn't have the gun ready like he just told me just a minute before, and, great, didn't want to be made to shoot, and I heard Mr. Nelson loading the gun, just pulling out of the driveway just prior to seeing the

> deer and knew that he had one shell, and Perry is yelling to shoot the deer, and that GMC truck has the automatic locks , and Mr. Nelson is banging against the door to get out of the truck to shoot the deer, and I knew what was happening, but the truck was in gear, so he couldn't get out, the door was locked, so I just reached over and put it in park , and the door opened. Mr. Nelson rolled right out of the truck.  The deer, it was like 20 yards away from us.  At first the doe had walked down the road, and just stood broadside, and Mr. Nelson shot once and just dropped it.  And Mr. Perry started screaming at us that we didn't shoot it out the window.  His exact quote was we are F'ing night hunting, he said, what makes a difference if you shoot out the window, you know, he was yelling at Mr. Nelson for getting out of the truck. Any way, we quick grabbed the deer and threw it in the back of the truck and we continued down the Bogg Road.
> ….
> While we took the deer to somebody's house and continued to night hunt until daylight….

(Id. at 108-10; see also id. at 212-14.)  The agent reported that he looked at the clock when the deer was shot and it was 4:04 a.m. (Id. at 115-16, 209.)

On cross-examination, defense counsel asked the agent apropos the morning of November 27, "Possession of deer killed at night.  How did [Perry] have possession of a deer killed that night?"  (Id. at 209.)  The agent responded:  "I thought that was pretty clear.  He yelled at us to throw it in the back of his truck, that's his possession."  (Id.)

> At the time [Perry] was screaming at us shoot the F'ing deer. I mean it was a tense situation for about 30 seconds of a lot of yelling.  It wasn't me yelling.  And I reached over and put it in park so the job would be done without me having to do it.
> ….
> [Perry] was very upset that we didn't shoot it from the window.  He said that time and time again.  Afterwards he was yelling at me for not shooting, at both of us, because specifically saying we are night hunting, why get out of the truck.
> ….
> [Perry] pulled out Chad [Nelson] and I.  We asked him what, because of first we didn't know what [Perry] wanted to do with the deer, and he was trying to make a decision if we were just going to cut it up or take is somewhere and have somebody tag it.
> ….

13

He told us to throw it in the back of the pickup, proceeded to Randy Burnell's house and Randy Burnell said he had a person that would tag it by daylight.

(Id. at 214- 15.)

Perry focuses on the evidence that Chad Nelson shot the deer and insists that he simply allowed the deer to be thrown into the back of the truck to transfer it from the scene. (Amended § 2254 Pet. at 3.) He cites his testimony that he was "upset and agitated about all that activity." (Id.) At trial Perry described himself as irritated on the evening of November 26 because he had to sleep in the bunk house with Chad, his kids and Bill, the agent. (Trial Tr. Vol. III at 124.) He said he had trouble sleeping and got up around 4:00 a.m., Bill asked him what he was doing and Perry replied that he was going to get something to eat, not that he was going hunting. (Id. at 124-26, 163.) Bill and Chad asked if they could go along and Chad said something about bringing his gun along, to which Perry said, "might as well, time we get back it will be day break." (Id. at 126, 163.) Perry explained:

> Bill didn't have his gun, so [Perry's girlfriend] had her gun in the back and put it in the front and said three bullets, I said, put them in your pocket so you have them when you get back, and Chad had his gun so we headed down, we pulled out of the driveway, headed down the road, got down over the hill and they yelled deer. And I said I couldn't see it, I'm looking for it. He said deer. And they said shoot it, shoot it. I said, turn around, shoot it? You ain't shooting nothing in this truck, I tell you that right now. I want to look at it. Rolled the window down. I said I don't care if you are looking at it or not looking, you get the hell out of my truck if you shoot out of the – and that watch [sic] you call it, Bill said shoot it. He said my gun's jammed. I said you ain't shooting that in my truck. And he reached over in the meantime – this happened, this was happening, I'm looking trying -- deer is – trying to see the deer they are talking about. In the meantime Chad got out of the truck. I yelled don't shoot it Chad. And he shot, boom. So the deer, it was down. It was over. I was mad. Slammed it in the thing, said get out, throw it in the truck, throwed it in truck. I backed up into my dooryard sitting there, said skinning the deer here, and I said you ain't skinning nothing at my house, and I said ---

> ….
> Chad and Bill said we'll do it right here and put it in Bill's van.  I said you
> are the one that wanted the deer and doing this, I said tell you what, get rid
> of this, [Perry's girlfriend] would be pissed[,] I know, just where to  -- take
> it down to Randy and done the thing to me the day before, took it to
> Randy's, get rid of it, went in the house, had coffee, then when they got rid
> of it came back to the house.  I was pissed but on the way over I told
> [Bill], I says, you an undercover?  He said no, I'm not….

(Id. at 127-28.)  Perry explained that when Chad went to put his gun out the window

Perry told him he could not even look at the deer through the scope because that was

night hunting, (id. at 129),  and he told him to "get the hell out" (id. at 165).   He waxed:

> Happened so fast.  I said, you ain't shooting nothing in my truck.  We are
> not doing it, know what I am saying.
> …
> Bill was yelling and look, between Bill's yelling and confusion, Chad got
> – Chad was outside, and the yelling, he got confused, and he pulled the
> trigger,  I don't know if he did it on his own or talked into it, how it went,
> but a lot of shit going on in a very few split seconds.

(Id. at 129.)

On cross-examination Perry acknowledged that he was driving the truck and

brought the truck to a full stop.  (Id. at 164-67.)  He claimed:

> I was driving along and stuff, I stopped.  Like I said, I can't remember
> everything clear.  All I know is I told them – it was confusing.  I told them
> not to shoot.  I told Chad you ain't shooting nothing in this truck I can tell
> you that right now. I'm just going to look out the window.  And I said
> same thing as night hunting, no, you are out of here.  You have that deer
> you are out of the truck.

(Id. at 166.)    Perry, who stated he was going ten to fifteen miles per hour, professed that

he stopped on the command of Bill and Chad and because the deer was in his path.  (Id.

at 167-68.)  He testified:

> Chad had gotten out of the truck and Bill yelled shoot and Chad shot.  And
> when he shot, when he shot I told Chad get in the truck, and I floored it to
> – I said you guys pick the deer up, put it in the truck and we were out of

> here, and went back to the house and said we are skinning it here and I
> said you ain't skinning nothing here.

(Id. at 168) (emphasis added).  Perry conceded that he drove thirty to forty yards to

collect the deer where Bill and Chad loaded it into the truck and that after returning to his

yard he then drove fifteen further miles to Randy's house. (Id. at 169-70.)[7]

Although Perry insists that he was opposed to and angered by the killing of the

deer his own testimony is that he directed that the deer be put in the truck and, rather than

acquiesce to the transference of the remains to Bill's van, he insisted that he drive the

carcass to Randy's house.  The instruction was: "In order to prove the charge of illegal

possession of deer killed at night, the State must prove beyond a reasonable doubt that

Mr. Perry possessed a deer that had been killed during the period from 30 minutes after

sunset to 30 minutes before sunrise of the following day."  Perry's own testimony

supports the conviction on this charge.  The forfeited error concerning the missing

element of the accomplice instruction did not seriously affect the fairness, integrity, or

public reputation of judicial proceedings.

***Undercover Warden Participation in Criminal Activity and Whether it Renders His
Conviction Fundamentally Unfair***

Perry gives short shrift to his arguments on his claim that the undercover warden's

participation in the criminal activity renders his convictions fundamentally unfair.  He

opines:

> In the course of the investigation the undercover warden committed and or
> participated in committing numerous criminal offenses, including possession of a
> loaded firearm in a motor vehicle, driving deer, accomplice to night hunting and
> possession of illegally killed deer and hunting with too many dogs. He also drank
> with the subjects of his investigation. eg. Tr. I Pages 125, 126, 132, 160, 161, 162,

---

[7]     In terms of the jury's weighing the credibility of the agent's version against that of Perry's, there is
also the testimonial layer as to Perry' prior history of similar offenses as being the stimulant for the
undercover operation.  (Id. at 144-47.)

164, 180, et seq., 186, 189, 193, 195, 207, 209, 212 et seq., TR. II. 127 et seq., II.
24, 25, 29, 61, 62, 63, 210.

      The actions of the Maine Warden Service violated fundamental Due
Process rights of Petitioner. 5th and 14th Amendments, United States
Constitution; <u>United States v. Russell</u>, 411 U.S. 423, 432 (1973); <u>United States v.
Santana</u>, 6 F. 3d 1 (1st cir. 1993).

(Amended § 2254 Pet. at 5.)  The State tenders an equally brevis treatment of this ground,

in which it cites <u>Russell</u> as the clearly established federal law for purposes of 28 U.S.C.

§ 2254(d)(1) and unhelpfully references en mass the "attached state court record –

especially the trial transcript." (Mot. Dismiss at 7.)[8]  Perry's response to the motion to

dismiss does not even whisper a word about this ground.

      The trial court did give an entrapment instruction.  (Trial Tr. Vol. III at 22-23.)

With respect to his constitutional challenge on appeal,[9] the Maine Law Court reasoned

apropos this claim:

>       Perry contends that the undercover warden's conduct in violating
> the fish and wildlife laws on numerous occasions, in drinking alcoholic
> beverages with the targets of his investigation, and in inciting participants
> to commit illegal acts was so outrageous as to violate notions of
> fundamental fairness. The court instructed the jury on entrapment, and the
> jury obviously found that Perry had a predisposition to commit those
> crimes for which he was convicted. The remedy that Perry requests for the
> warden's conduct is a vacation of his convictions and a remand for the
> dismissal of all of the charges against him.
>       We have acknowledged that there may be cases in which
> government officers are so enmeshed in the criminal activity that the
> prosecution of another participant in that activity might be "repugnant to
> our concept of criminal justice." <u>State v. Smith</u> 615 A.2d 1162, 1165
> (Me.1992). The warden's activities here were clearly designed to ingratiate
> himself with Perry and Perry's friends and clients so that he could
> personally observe violations of the fish and wildlife laws. His testimony
> was replete with instances of how he attempted to avoid committing a
> crime personally. We are not convinced that the warden's conduct was so
> outrageous that due process requires a dismissal of all charges.

---

[8]     The prosecutor did refer to <u>Hampton v. United States</u>, 425 U.S. 484 (1976), discussed below, in
responding to the defense's motion to dismiss which was premised on the undercover agent's participation
in the criminal violations.  (<u>See</u> Trial Tr. Vol. II at17.)

[9]     The State concedes that this claim was adequately presented as a federal claim to the Law Court.

Perry, 2006 ME 76, ¶¶ 26-27,  899 A.2d at 815.

In Russell the United States Supreme Court addressed a claim that an undercover agent's participation in the drug activity, to the extent that he supplied an essential ingredient for making processed methamphetamine, was entrapment that arose to the level of a due process violation.   First discussing Sorrells v. United States, 287 U.S. 435 (1932) and Sherman v. United States, 356 U.S. 369 (1958) as the precedents recognizing and applying the entrapment defense, vis-à-vis the defendant's argument that there was a constitutional right at stake, the Court stated:

> While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, cf. Rochin v. California, 342 U.S. 165 (1952), the instant case is distinctly not of that breed. …. The law enforcement conduct here stops far short of violating that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment. Kinsella v. United States ex rel. Singleton, 361 U.S. 234, 246 (1960).

Russell, 411 U.S. at 431-32.   The Court opined that the entrapment defense was not meant to confer a "chancellor's foot veto over law enforcement practice" on federal judges:

> The execution of the federal laws under our Constitution is confided primarily to the Executive Branch of the Government, subject to applicable constitutional and statutory limitations and to judicially fashioned rules to enforce those limitations.  ….
> … [E]ntrapment is a relatively limited defense. It is rooted, not in any authority of the Judicial Branch to dismiss prosecutions for what it feels to have been 'overzealous law enforcement,' but instead in the notion that Congress could not have intended criminal punishment for a defendant who has committed all the elements of a proscribed offense but was induced to commit them by the Government.
>     Sorrells and Sherman both recognize 'that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution,' 287 U.S.

at 441. Nor will the mere fact of deceit defeat a prosecution, see e.g., Lewis v. United States, 385 U.S. 206, 208-09 (1966), for there are circumstances when the use of deceit is the only practicable law enforcement technique available. It is only when the Government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play.

Id. at 435-36.

The next chapter in the Supreme Court discussion as to whether or not the

entrapment tactics of law enforcement agents can give rise to a claim under the

Constitution is Hampton v. United States, 425 U.S. 484 (1976). The plurality decision

authored by Justice Renquist and joined by Chief Justice Burger and Justice White,

concluded:

> The limitations of the Due Process Clause of the Fifth Amendment come into play only when the Government activity in question violates some protected right of the Defendant. Here, as we have noted, the police, the Government informant, and the defendant acted in concert with one another. If the result of the governmental activity is to "implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission . . .," Sorrells, supra, 287 U.S., at 442, the defendant is protected by the defense of entrapment. If the police engage in illegal activity in concert with a defendant beyond the scope of their duties the remedy lies, not in freeing the equally culpable defendant, but in prosecuting the police under the applicable provisions of state or federal law. See O'Shea v. Littleton, 414 U.S. 488, 503 (1974); Imbler v. Pachtman, 424 U.S. 409 (1976). But the police conduct here no more deprived defendant of any right secured to him by the United States Constitution than did the police conduct in Russell deprive Russell of any rights.

425 U.S. at 490-491.

Justice Powell, joined by Justice Blackmun, concurred in the judgment cabining

his agreement with the Renquist opinion:

> Petitioner, Charles Hampton, contends that the Government's supplying of contraband to one later prosecuted for trafficking in contraband constitutes a Per se Denial of due process. As I do not accept this proposition, I concur in the judgment of the Court and much of the

19

plurality opinion directed specifically to Hampton's contention. I am not
able to join the remainder of the plurality opinion, as it would
<u>unnecessarily reach and decide difficult questions not before us</u>.

<u>Id.</u> at 491(Powell, J, joined by Blackmun, J, concurring) (emphasis added).   Powell

explained:

> The plurality thus says that the concept of fundamental fairness
> inherent in the guarantee of due process would never prevent the
> conviction of a predisposed defendant, regardless of the outrageousness of
> police behavior in light of the surrounding circumstances.
> I do not understand <u>Russell</u> or earlier cases delineating the
> predisposition-focused defense of entrapment to have gone so far, and
> there was no need for them to do so. In those cases the Court was
> confronted with specific claims of police "overinvolvement" in criminal
> activity involving contraband. Disposition of those claims did not require
> the Court to consider whether overinvolvement of Government agents in
> contraband offenses could ever reach such proportions as to bar conviction
> of a predisposed defendant as a matter of due process.  <u>Nor have we had
> occasion yet to confront Government overinvolvement in areas outside the
> realm of contraband offenses</u>. Cf.  <u>United States v. Archer</u>, 486 F.2d 670
> (CA2 1973). In these circumstances, I am unwilling to conclude that an
> analysis other than one limited to predisposition would never be
> appropriate under due process principles.

<u>Id.</u> at 492-43 (emphasis added, footnotes omitted).

Justice Brennan penned a dissent, joined by Justice Stewart and Justice Marshall,

which criticized the plurality's subjective approach to the defense of entrapment, and

asserted that if the focus was placed on the police conduct and not on the defendant's

predisposition, Hampton's claims "allege a course of police conduct that …would plainly

be held to constitute entrapment as a matter of law."  <u>Id.</u> at 492-43 (Powell, J, joined by

Blackmun, J, concurring) (footnotes omitted).  With respect to the question of whether

entrapment techniques could generate constitutional dimensions, Brennan dropped the

following footnote:

> For present purposes it would be sufficient to adopt this rule under
> our supervisory power and <u>leave to another day whether it ought to be</u>

20

> made applicable to the States under the Due Process Clause. In addition to the authorities cited in Russell, supra, at 445 n. 3, (Stewart, J., dissenting), some state courts have adopted the objective approach. See, e.g., State v. Mullen, 216 N.W.2d 375 (Iowa 1974); People v. Turner, 390 Mich. 7, 210 N.W.2d 336 (1973); Lynn v. State, 505 P.2d 1337 (Okl.Cr.1973).

Id. at 500 n. 4 (emphasis added).

The United States Supreme Court has yet to wade further into these waters in the aftermath of the fractured Hampton decision. [10]  In short there has never been a United States Court precedent that has concluded that entrapment type conduct can even give rise to a constitutional claim.  Accordingly, there is no way that the Maine Law Court disposition of Perry's fundamental fairness entrapment claim is contrary to or an unreasonable application of "clearly established Federal law" as set forth in "the holdings, as opposed to the dicta," of the United States' Supreme Court "decisions as of the time of the relevant state-court decision." Musladin, 127 S. Ct. at 653; see also Locke v. Cattell, __ F.3d __, 2007 WL 431162, * 7(1st Cir. Feb. 9, 2007).

In view of my recommendation that the court deny Perry relief on both grounds of his amended 28 U.S.C. § 2254 petition, I also recommend that the court deny his motion for stay of the state court proceedings.

### *Conclusion*

For these reasons, I recommend that the Court **DENY** Perry's amended 28 U.S.C. § 2254 petition (Docket No. 7) and **DENY** his motion requesting a stay of his state court proceedings (Docket No. 8).

---

[10]     The closest they came when they put a toe in the water in a footnote in United States v. Payner, 447 U.S. 727, 737 n.9 (1980), a passage which, relying on the plurality in Hampton,  is certainly dicta.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.


/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

Dated February 13, 2007.